May it please the court and counsel, my name is Martin Serkiel, myself and my colleague Kent Cardner here before you representing Josue Estrada in this appeal against the San Antonio Independent School District. And of course a special welcome to the newest member of the Fifth Circuit Court of Appeals. A heartfelt congratulations to you and your family. It's a great honor and blessing. First and foremost, we want to let the court know that we are working on the Section 504 of the Rehabilitation Act, which is predicated upon a hostile educational environment. This follows the case law that devolves from Title IX jurisprudence, Davis v. Monroe County Board of Education. And more recently, it clarified in this circuit in Stewart v. Waco Independent School District and the Lance v. Louisville Independent School District cases. So what that means is we're keeping our Section 504 complaint alive regarding the gross misjudgment of the young man's educational plan and the gross deviation from professional standards of care. We're also keeping alive our ADA claim, and we'll talk about both a little bit more fully. You may be able to hear it in my voice, and I apologize to the court. I've had a respiratory infection the last five days, so I'll do my best to be as That being said, we trust in the pleadings. We trust in the record before us. We ask the court to be mindful of the fact that this is a case brought before you on a motion for summary judgment. And we understand there's been a recent decision by the Supreme Court in Tolan v. Cotton, No. 130551, decided May 5, 2004, that lets us remind us that we leave decisions best regarding the veracity and credibility of witnesses and exhibits and testimony to a jury, not a judge. I have to be honest, when I first got this case about five years ago, and the court may know, and if they don't know, they'll know as we get into this record, probably the last 15 or 20 cases dealing with special education issues and disability rights issues are cases I've been involved in. Sometimes I call myself the biggest loser. But that being said, I'm before the court again on a case that, as we've seen in other civil rights cases over the course of our lifetimes, things change. So when I first got this case really five years ago, I looked at it, and based upon what I had seen in previous jurisprudence from Monaghan, the case, from the DA case, from other cases in other circuits, to me, this is a case that brings before the court maybe for the first time what I would call the perfect storm, all the issues that actually can help us understand what is a gross misjudgment of a child's educational plan, what is a gross deviation from professional standards of care. I shared this with my colleagues five years ago, and of course we're before you now on that as well. It's really not a new standard. It emanated from Youngberg v. Romeo in early 1982 that asked the courts to give discretion, of course, to professional standards of care, unless there might be a great gross deviation. Help me if you can tell me which claim you're talking about. You know, you've got several claims here. If you can isolate those out and talk about each one of them, it would be helpful to me. I'll do that, Your Honor. In fact, let me just kind of get started with the story, because I think the story about the case will help, I hope, at least clarify what those claims may be. And I think it's important to talk about what's called the and also the child's entire educational plan that's also used in the Hovum case that was also before this Court about a year or two ago. So anyway, in the spring of 2006, the Brackenridge High School experienced very, very troublesome rash and molestations by aid in the private bathroom in the Life Strides classroom. In response, the school adopted a practice by any other name of professional standard of care that any time a student needed to go into that private bathroom, that segregated bathroom, there would be two people with them. Now, let's forward to about two years later in April of 2008. Josue Estrada is in a class, a special education class, with his special education teacher, Bonnie Byerly, and Brett Jernigan, the aide, follows him in. Now, it's very important as we go back through the file, we go back through the pleadings, and we talk about what's part of his IEP and what's a gross deviation from the IEP, that there's nothing anywhere in this voluminous record that gives this guy permission to go into the class with the kid. There's discussion about how he can go with him across the halls, there's questions, or there's testimony about how he can go with him into the cafeteria or obviously into the bathroom. But what was this guy doing in the classroom? There's no IEP, there's no assessment, there's nothing giving him permission to be in the classroom, but there he is. It's horrible what happened, I think we'll all agree. Does the IEP have to involve a significant background check on any school employee who comes in contact with the person? I mean, the IEP is a very noble goal of providing an adequate education to people who have certain situations that need to be dealt with, and here, he graduated, which is a good indication that he did get a good education despite this horrible incident. I think there were over 25 meetings that his mother was able to attend to formulate the IEP. So, I mean, what is it exactly about the IEP that you think is deficient, and what cases would support that? Well, what I would say, once again, in looking at the IEP, and I will talk about the Hovum case for a minute. The Hovum case for a minute, the Hovum case said that not only do we look at the IEP, but we look at what's surrounding it at the IEP. We're looking at the total child's experience, and I think in fairness to the IEP issue, when a child goes to school in the morning, not only do we expect them to come home and do well in class at the end of the day, or when we start them in school, in kindergarten, we expect them to graduate, which is part of what the IEP is intended to do. We also expect them to be safe, and I don't think it's fair to say that if a child gets A's and B's, but they're molested, then the school did their job. So I'd respectfully do that. Oh, sure, but what was missing from the IEP that was required that would have solved this or prevented this situation? Well, the part of the IEP has to do with training and supervision, and one of the things that we saw through the testimony is that this gentleman never got the supervision that was required. I was telling about the story that occurred in the classroom, and I'm going to go back to that for a minute and then answer your question. So he's in the classroom with Brett Jernigan, which is part of his IEP, being the students in the classroom, and Jernigan's taking pictures of all these boys on his phone, and then the teacher tells him to stop, so he stops. Then Jernigan has the boys in the back of the classroom, and they're on their way to school. The teacher's troubled by all the kids giggling and looking at the computer, and she goes over, she sees that there's pornography on the computer, she shuts it down. What's particularly troubling to her in the letter that she sends to the principal of the schools, not only did all these things occur, but that Josue Estrada is trying to protect this guy, which is obviously troubling. So they send the report to the principal. She refers it to this gentleman, Mr. Castro. Mr. Castro doesn't do anything. We want to talk about gross deviations from professional standards of care, Judge, which is also part of the standard, not just a gross violation of the IEP, but also a gross deviation from professional standards of care, so it's kind of an either, or, and, also. So here we go. So they do this, he brings Jernigan in. He doesn't look at the phone, even though he's using the phone to take pictures of boys in the classroom, which later turns out to have pornography on it, by the way. He doesn't look on the website called deviantart.com. He doesn't interview any of the kids. He doesn't interview Josue. He doesn't interview the teacher. And in the course of his investigation, during the deposition, he admits that this guy's not supervised. This guy goes around the campus and does what he wants. He's unsupervised. So supervision is a very, very important part, and training is a very, very important part of the provision of services to a child under an IEP. So I hope I looked back and answered that at least partially. Excuse me a moment. Do you have any case finding an IEP was grossly mismanaged in a situation like this that wasn't directly related to the school curriculum but more of a safety issue? I will tell you, Your Honor. We might have to go back and provide that with a letter brief with the court's permission. I won't go as far as to say that this is a case of first impression, but it could be. It could be. Maybe Mr. Marzak would be able to shed some light on that issue too. But this is an emerging area of the law, and so I don't want to overstate or understate it. So we'll do some research and we'll come up with something and provide it to the court as a supplement with the court's permission. So once again, at this very, very important time, when this young man's in this classroom and we have this guy, Brett Jernigan, following him around in the classroom, and nobody really knows why, and it's not part of the IEP. There's no assessment. And as we do know for individualized education plans, it's assessment driven. There's no report. There's no assessment. There's no ability to give this guy permission to go in and do that. But nevertheless, he's there. The investigation, to call it an investigation, shows that he's unsupervised. We believe these failures by themselves rise to the level of a gross deviation from professional standards of care. How could any reasonable professional think that that was an appropriate investigation? Later on, there was a deposition of the school principal, Ms. Marsh. And she agreed that the type of acts that occurred in that classroom would normally rise to the level of a sexual harassment claim under the school district's own policies and procedures for Title IX. And when you have that type of a level of incident, and it kicks in a certain type of investigation under their own policies, it's obviously a lot higher level of scrutiny and investigation, which... But weren't you not relying on that? Didn't you tell us at the beginning that you're not relying upon that, that hostile educational environment and similar to the... Not as a separate claim. But we do believe, we do believe that the failure to keep the young man safe, based upon the constellation of the other circumstances, does rise to the level of a gross deviation from a professional standard of care. I'm sorry if I didn't make that clear. Okay. Does it have to be related to the IEP? Can you clarify? The gross deviation just has to do with the principal not responding? This is my read. But the IEP was, if anything, there's little quibbles on the IEP, and I think under some of our authorities, some would say that the quibbles don't get you there. I would agree. I think, and once again, this is an emerging area of the law. To my knowledge, if this was purely related to a gross mismanagement or a gross misjudgment of the child's educational plan, then I think we would not be in the position of best light. But I think the language that has evolved over the course of 30 years now, from Monaghan forward, is that the other standard that can be met is a gross deviation from professional standards of care. And that clearly means something, then, not only the IEP, because when you're dealing with a free appropriate public education, you're dealing with issues not only related to their academic, but their non-academic issues. You're also dealing with their safety. So my answer to you is it's not solely related to the IEP. Can you just give me a minute? If I ask you a favor, because of my illness, I want to just get some water real quickly. Take me two seconds. I'm really sorry, Your Honor. I'm on some medication, and I'm not doing as well as I would like. Go ahead, Your Honor. Can you just succinctly tell me under what act you think you should prevail and what the predicate for liability is that allows you to prevail? Let me talk about the ADA case, then, for a minute, because I think that's a lot clearer. Give me your best case. Yes, sir. In the ADA issue, we have two cases that are compelling on this Court. One is Delano Pyle v. Katoria County, and the other case is Barnes v. Gorham, the United States Supreme Court case. In Delaney Pyle, there was a gentleman who found that his rights were violated under the ADA because he wasn't given an interpreter. Real simple. He wasn't given an interpreter. Under Barnes v. Gorham, the Court found that Gorham's rights under the ADA were violated because he wasn't given safe passage in a vehicle. In this case— Is there a deliberate indifference standard required for recovery under ADA? No, there's intentional discrimination, Your Honor. And the intentional discrimination in this case is based upon the school district's own affidavit and testimony, is that they had five urinals that males could use to go into the bathroom. And this may be a little bit—I've got 38 seconds—but for a gentleman in a wheelchair to use the bathroom, they can take themselves in. So the fair question in all this is why was Jose Estrada taken across the school into a private bathroom to put up on a toilet when he could go to the bathroom by himself? And we would argue that if there was no interpreter in Delaney Pyle, if there was no safe passage in Gorham, then clearly for this person not to get a urinal that he can use on his own equally violates the ADA. I went fast. Thank you so much. May it please the Court, Counsel, my name is Philip Marzek with the law firm of Escamilla and Ponic in San Antonio. I represent the San Antonio Independent School District in this case. Judge Garcia correctly granted summary judgment for the appellee defendant San Antonio ISD in this case because the plaintiffs have failed to present any evidence that raises a reasonable inference that the San Antonio Independent School District acted with professional bad faith, gross misjudgment, or deliberate indifference towards the student. There is no evidence that SAISD intentionally discriminated against the student, which Mr. Sergio just said that that's the standard he is going under under his ADA claims. There's no evidence that there is discrimination against him because of his disability. SAISD provided a free, appropriate public education from pre-K through graduation over 16 years for this student. These are really bad facts against the principal's judgment here, right? No, Your Honor, I disagree in terms of . . . The principal allowed this person who was already under suspicion to cavort with this and go around with this young person who they were already suspicions on, and also take them to remote restrooms when there's another kind that you could go to. Isn't that true? That's not true, Your Honor. Explain to me why not. Certainly. First of all, there was no suspicion as to this particular employee that he would engage in homosexual pedophilia. No, but the fact that if he's showing pornography to children in the classroom, that's like a number one thing that when you're grooming people, you show them sexualized things. That's a lesson in pedophilia, which unfortunately we have many cases about child porn in our circuit. Certainly, Your Honor. However, I disagree that this was a case of child porn. What in this case . . . The facts of this case is you take a look at the case and look at the record that what was shown, what was . . . Actually, what was happening was that Mr. Jernigan was looking at a computer screen at a site that, although it has a salacious name, is a site of individuals who present their own artwork and place it on this website. The actual art itself was described by Ms. Byerly as a suggestive female. In other words, the evidence that we had before that it was the picture of a back of a female that didn't seem to have any clothes on, but it was her back. Therefore, in that case, if you were to claim that that is now soft porn, then almost every print advertisement, almost all TV advertising becomes soft porn. The teacher thought it was very inappropriate. The teacher thought it was inappropriate, but being inappropriate doesn't necessarily mean that it's . . . that now alerts us to the fact that this individual has a high . . . there's a high risk of abuse by this individual. If they had already had a problem in the district, and they have a policy that you're not supposed to go by yourself, if the principal allows the person who's already getting in trouble to go by himself, that seems like really bad judgment. Well, Your Honor, it may be bad judgment. First of all, there's no evidence in this record that the principal knew that this individual was going by himself to the restroom. Now, the IEP allowed the fact that there was, for the most part, there was to be a two-person lift. That was done for purposes of physical safety, not to prevent any kind of assault on a child. The purpose of that was so that because this child had cerebral palsy, and protect not only the student, but other employees who may not be able to lift this student, that they would be able to help that child get out of his wheelchair and on to the toilet. Wasn't there a policy, though, apart from the IEP, about two persons in restrooms? The principal, Your Honor, suggested that she wanted to have, because of the incident that had happened almost three years prior, that she wanted to have, at every chance possible, that there would be two people who would accompany someone to the restroom. That's a policy that she implemented in her school, right? Well, that is not in the sense of a policy that was created by the school district and by the Board of Trustees, which if we're going to, if what we're looking for is whether there was a policy that was put into place that was, number one, caused this violation of his rights, that certainly wasn't approved by the school board. This was a decision of the local principal who said, this is what I would like to see happen. And as far as she knew, it was happening. And in this case, the evidence is that in over 92 percent of the time, that is exactly what happened. But the other 8 percent of the time, he was molested. No, Your Honor, that's not correct. There were some, either 10 to 15 times that it was affected, he was affected by a one-person lift. And on three occasions only, was there a situation in which he was ... I don't know if that was 8 percent or not, the 92, and I don't know how many times, the gross number of restrooms. There were three incidents of ... Three times in the 8 percent, he was molested, and the principal knew that this was a problem in general because she had already had another molestation incident, and she said, this is the rule. But you're telling me the record shows that she had no knowledge that he was going by himself with this person. Who knew? The only person that knew was Mr. Jernigan. He says that, in the record, he says that he saw one of the teachers as he went in there and went in by himself with the bathroom. However, the teacher says she never saw him there. How is it possible that ... So the record shows that the only person who knew that Mr. Jernigan was going by himself was Mr. Jernigan. The teacher didn't say ... And the student, Your Honor. The student obviously knew. But how come the teacher didn't ... I don't understand that record because if they're leaving class to go to the restroom, then they're going off by themselves together. I don't understand why he's ... The reason why this teacher who was in the classroom ... Understand that this child is in general education classrooms. When he leaves that classroom, the only person he's ever going to be with is Mr. Jernigan because two people were not assigned to him throughout the day. Mr. Jernigan then goes to the Lifestrides bathroom, which is between two other Lifestrides classrooms. At that point, he is to try to find an aide who is assigned to that classroom or in that general area to assist him with the transfer. He goes into that room, always by himself with the student. He is then to try to ask one of the aides, not the teacher who's there, to help him do that, on occasion because the teacher is not to determine when he wants to go to the bathroom. We did not set up a schedule where he had to go every certain couple hours. The student goes, so there are going to be times when someone is not available to help Mr. Jernigan. Didn't the principal have a responsibility to train Mr. Jernigan that under no circumstances if the other aide is not available ... I'm not saying any of this is actionable under actually the IEP, but I'm just talking as whether the principal did her job. Didn't she have a job to teach him not to ever take someone to the bathroom, since that's her rule at her school? If the teacher aide is not available in the life class, that they've got to go find somebody else? The principal maybe herself has to go or someone else? Maybe she does, Your Honor, but number one, let me address the fact, number one, that Mr. Serkiel today seems to suggest that what we're looking at is a gross deviation of standard of care. That's not the standard in any of these cases. It's a matter of deliberate indifference in these cases where it's a sexual assault of a student. The question is, what did you know? Were you put on aware that someone who could take action was put aware that this person, there was a high risk probability that there was a sexual assault could be occurring or might occur? There's no evidence of that. And to try to address your statement, this man was trained that he was not to do that. He admits in his deposition that he knew that he was supposed to try to find someone else. However, the school district, the special education department, had developed both procedures for both two-person lifts and one-person lifts. And so I can't say that in every single case that there would be a situation in which it would always have to be two persons. There is no evidence, other than this one incident in Mr. Byerly's class, which in my view of it and based on the case law, if you take a look at the cases relating to this, does not raise an awareness of the school district that this was a potential pedophile and that he should have had taken action. But even then, Mr. Castro did take action. Despite what Mr. Serkeel did, Mr. Castro, who was his supervisor, brought him in, said this is inappropriate, what you're doing, taking photographs, looking at computers, looking at these images, this is inappropriate and it must stop. This was the first and only time they'd had an issue like this with Mr. Jernigan. Prior to that, he'd been a substitute teacher without any complaints. Up to that point, there'd been no complaints by either the parent or the mother during ARD committees. There was just no reason to suggest that at this point, that anything other than a memo to the file and a discussion with him should take place. Now, I understand afterwards. No, Your Honor. I mean, at this point, number one, remember that in this classroom, he's not being accused to Mr. Castro that he's only showing it to this student, but he's showing it to several students. I don't think so, Your Honor. If I had somebody who was assigned to me as my aide and became my friend, which clearly happened in this case, whether we were having a sexual relationship or not, I certainly wouldn't want to see that person get into trouble. But other than say, hey, she's coming, I don't understand how that's inordinate. Had the child come in and advocated on behalf of Mr. Jernigan, I understand that perhaps that might have raised some red flags that the district should then have looked at. But in this case, what we have is the best in this record. Mr. Cerquiel seems to have abandoned his claim in terms of saying that we failed through the IEP process. The evidence in this case, the record shows that we clearly took the time to prepare individuals' IEPs despite his complaints about the boilerplate language and the check the box. The Laughlin case clearly states that there's going to be cases in which the same sorts of things are going to apply to all students. So the mere fact that we have check boxes or that we have some boilerplate language does not mean that there's a deficiency in the IEP. Does the record show that the school district made the usual careful background check of Jernigan before they hired him? In this particular case, at the time that they did the background, it was not mandated that they take, do criminal checks as it is today. However, the record is clear that had they done that check, they would not have found anything. There was no criminal activity, nothing that would have raised any factors. What had he done before he came to work for the district? Your Honor, I don't remember myself. What we do have is that he had come and worked at the district as a substitute teacher. There's nothing in the record to indicate that there was any kind of complaint from any previous employer, but I can't tell you that the school district certainly, you know, did any more than what would have been general inquiries of did you work there or did you not? Does the school district now have a policy that you shouldn't be taking people to the restroom alone now that they've had multiple people abusing people in the restrooms? There's not a board policy to that effect, but yes, they are in general are trying to use that so that there's not a situation in which there's one person alone with a student. You said in general, they're trying to use it or is there a policy or not? There's not a board policy. I believe that there's not a, but a board policy would appreciate everything. The special education department certainly expects them to not have one person alone with a student in the bathroom. In this particular case, most of the Lifestrides, I don't even know if they're even using that bathroom anymore, but they, in this case, everyone agreed that this was the appropriate one to use. Again, this bathroom is not a bathroom that can happen anytime you have one person there. Yes, that would be some protection, but remember that even three years before that incident, one of those incidents happened in a closet. So there's no way that the school district can make sure that there's no one that ever goes alone with a student in an enclosed space. It's just impossible. This private bathroom was behind a locked door, I assume, with one person. This particular one did have a lock on the door. It was the one set who was the best bathroom in this particular case because it had sufficient room for him to bring in his motorized wheelchair and for two people also to be within that room to be able to do the lift. It also had lifting apparatuses for some students who could use that. It had changing tables for the students. The other bathrooms, and they were ADA compliant. There's no doubt about that despite the claims of the plaintiffs. Prior to this particular incident, before this incident, they had urinals that were compliant. There were stalls that were compliant, but during none of the ADRs in which we developed these IEP plans, did anyone say no? Did the parent or the student say, no, I want to go use these other bathrooms? There was no objection to using the Lifestride's bathroom. The only incident the plaintiff cites for notice of, again, Mr. Jernigan's potential sexual harassment was the Barley incident, and we've discussed that. There are two incidents, right? I'm sorry? Photos and internet. Well, he was taking photos of students, which again would be, but there was nothing, it all happened on the same day. It doesn't matter, but there's two things. He took photos and he was on the computer with the children. Two things. Okay, Your Honor, but I guess to me, number one, they happened at the same time. Basically, same period of time frame. Secondly, the issue of taking photos of students is more of a privacy concern with the school district that that would suggest, especially since there's no indication that the children were disrobing in any way when they took these photographs. Students take photographs now because they have these phones that take photographs of their teachers with themselves on a regular basis. This is not an unusual situation. The teacher believed that this was inappropriate. I'm sorry? Teachers are not supposed to be taking pictures. Of course, we did have something in the news where a teacher in Texas took a picture of themselves doing something completely inappropriate in the classroom this past year, but teachers and authority figures are not supposed to be pulling out their cameras, and that's not a good thing to be doing. Apart from privacy, it also shows a strange interest in the students, which could, that would not be a good thing to have happen. I can't agree with that. It's in the courtroom, it's taking pictures of the boys in the class. I agree with you. In this particular incident, I think it was inappropriate, and that's why it was addressed. There are, under Texas law, there are certain, there's a, there's not even a requirement to get permissions from a parent if you are taking some photographs as a part of the educational process, but that's not what this is, so I agree with you. In this case, it was inappropriate. California is an enormous school district. This has happened twice at this school. Has this been a problem at other schools, or is it just unique to this school? It was unique in the sense that it happened to special ed students. These are the only two cases that I'm aware of, and I've worked for the school district for some 16 years, and this was, this is the only case other than, and there was no litigation that arose out of the other abuse situation, which was more than one student, but this was the only time that there was a situation in which special ed students that I'm aware of were at an issue. There are, as you can probably imagine, myriad of issues of students that are occasionally think they fall in love with their teachers and vice versa, which are obviously inappropriate and we have to deal with those kinds of things, but this is, was certainly of the, I think it's five cases that I've dealt with for San Antonio ISD over those many years. Some were third party matters, somebody outside. The question was, did we allow access? There was another situation where there was a relationship between a student and a teacher, but again, that was under Title IX. There was clearly no evidence to the district that there was anything like this going on until after the student made the outcry and the teacher resigned immediately. So, and in fact, this district takes the position that this is really what this case is about. It is a sexual, more properly, a sexual harassment case under Title IX, but however, the plaintiffs in this case clearly couldn't meet the burden of deliberate indifference in this case, and so therefore they tried to find a way to bring in 504, to bring in the ADA to say that somehow we failed in their IEP, which ended up resulting in this, and it just doesn't work, your honors. It just doesn't work. This is not the case for that. This is a case that this individual sexually harassed the student and it should be followed under the Gebser rules and that's what should apply in this case, and they need to show conscious disregard and that it just, there's no evidence of that in this case. If there are any other questions, I'll proceed the rest of my time. Okay, thank you, Judge. Thank you. Okay, Mr. Sarkeel, back to you. Thank you. Gebser is for regular education students. Gebser is for regular education students, non-disabled students. Non-disabled students, disabled students are protected under Section 504 and the ADA, and when it comes to their educational plan, the IEP. And let me put it kind of . . . But doesn't the case law say you borrow the Title IX standard in a deliberate indifference situation? Yes, but we rejected that claim because based on, under Stewart and under Lance, we didn't believe we could make that anymore. But I think it's one thing that came up in your question and it gave me a chance to ponder a little bit and let it percolate some, is that the Lance case that was recently discussed clearly delineated that there are children with disabilities, some are under special education services, and some receive what are called Section 504 services. Children that receive special education services have IEPs. Children that receive Section 504 services don't have IEPs. So the issue of a gross mismanagement of a child's educational plan is not solely relegated only to the IEP. It really relates to the educational service plan that they receive. So I wanted to clarify that issue. And you're looking at me funny for that, Your Honor, so . . . No, it's . . . Go ahead. The bottom line is how can you have an ADA claim when the facilities are ADA compliant? You're saying that because they didn't bring a second person that that's the claim. But that's not the requirement for ADA. And then on the plan for the education, that's not a proximate cause of this incident. So while this is very unfortunate, I don't . . . you've got to help us. Sure, absolutely. Let me clarify. The ADA issue had a couple pieces to it. One of the pieces was that this young man could go to the bathroom on his own, and he was never provided the accommodation to do that. That, pursuant to Delano Pyle, and that pursuant to Barnes v. Gorman, is an ADA violation facially. And that failure to give him the ability to go to a urinal on his own was a moving force in having him molested by someone else. He didn't need to have a two-person lift, because he could go to the bathroom on his own. But they had under their own policy a requirement that he have a two-person lift. He didn't get that. They had under his own IEP, going back to that, that was given by the physical therapist, that he was supposed to have a two-person lift. They didn't follow that either. We believe both those failures are gross deviations from professional standards of care. They went into the bathroom. They went into the school classroom, this Life Strides classroom. They have a teacher there named Ms. Davila. If you have any questions about some of the things I've talked about, read Jernigan's deposition. He doesn't have a dog in the hunt, as we say. Read his deposition. He'll tell you. He walked into that classroom, and he saw Ms. Davila, the teacher, and she said, sure, go in there alone. It's okay. Each and every time. That's a clear gross deviation from the professional standards of care that they set up on its face. And I want to bring to the Court's recollection again . . . Does that tie back to the IEP? Well, his . . . Isn't your claim dependent on the IEP? Come again, sir? Isn't your claim dependent on a problem with the IEP, your Rehabilitation Act claim? It's dependent on a gross deviation from professional standards of care in the delivery of his educational services, which includes, but is not totally relegated to, his IEP. It's more than just his IEP. That's what Holman said. That's what Stewart said, the totality of the circumstances. So, yes, it's the IEP, but it's more than the IEP. The other question that was brought up about what did the principal know or what did the principal not know. By admission, the principal didn't know. Nobody knew what was going on with this guy. This guy wandered the halls. He did what he wanted with Josue. That's a clear gross deviation of professional standard of care by failing to supervise him, which approximately caused the injury, I might add, Your Honor. He's still in the case, right? Jernigan? Yes. That case was severed. I think that's it, unless there's a last question or two. Okay. Thank you very, very much for letting us be here today. We appreciate it. Thank you. Thank you, gentlemen. We have your case.